and Michael Jordan. The appellant in this matter, Keith Jordan v. Michael J. Astrue, Commissioner of Social Security, Clause No. 063-5215. In this matter, Mr. Jordan believes he proved previously to the administrative law judge in this case that he was disabled prior to his date of last insurance, which was December 31, 1999. He indicates that he became disabled on March 18, 1999, following a car accident. Previous to the car accident, Mr. Jordan had had several surgeries involving his neck area. 1986, 1987, and 1994, he had cervical or surgeries on his neck. And then in 1999, he had a motor vehicle accident, which caused him to be unable to work after that. Now, in our – in my – in the brief sent to, Your Honors, Mr. Jordan has to prove that he was disabled prior to or – prior to the date of his last insured expirationage, which is 12-31-1999. With regard to the medical evidence that support that, Your Honor, I believe that there's ample evidence to prove that Mr. Jordan was disabled prior to – So where did the – where did the ALJ go wrong? He – he relied on the testimony of – okay, of his medical expert who testified at the hearing, Dr. Olmquist. He never examined, never treated Mr. Jordan. He relied on two medical reports, one of Dr. Lauperson and Dr. O. They saw Mr. Jordan one time each, one time each. Now, Mr. Jordan's doctors are – well, actually had a chiropractor, and that's part of the problem in this case, is that Social Security doesn't consider that. Who was the other doctor? Dr. Lamberton. Dr. Lamberton was another – was his treating – was a treating physician for Mr. Jordan, but most of his treatment came from the chiropractor. So the chiropractor, as you know, is not considered a treating source for the – under the Social Security Administration regulations. However, a chiropractor may offer evidence of functional limitations, which was what happened in this case. Well, did the ALJ treat Dr. Lamberton as a treating physician in his – He – he sort of wavered on that. What he said was that he's not sure whether to treat him as a treating physician, but he still ended up saying – ended up finding that he said that, okay, Dr. Lamberton saw Mr. Jordan in September of 1999, which was the day before – or prior to his date of last insured, 1-25-2000, and then 5-23-2000. And he wavered a bit, saying that just because he had only seen him three times, he wasn't sure whether to treat him. He said two times, and it was actually more than three, ultimately, but three in that immediate period. Right. Right. Correct. He did end up seeing him for several times after that. But the point is that Dr. Lamberton did say he was disabled, and the ALJ still said that, well, Dr. Lamberton didn't provide a longitudinal history with regard – didn't have a longitudinal history with regard to his treatment of Mr. Jordan. However, he really did, after you look at the entire record. But then he relies on the testimony of Dr. Almquist, Dr. Laupercette, and Dr. O. Dr. Almquist never, ever saw Mr. Jordan. Dr. Laupercette saw him one time. He rejected Lamberton's testimony because – I think, wasn't it Lamberton who opined that he needed – in order to work at a job, he would have to not walk or sit for a long time, and he'd have to have an opportunity to lie down during the day? That's correct. That's correct. He did say that. That's consistent with Mr. Jordan's own assessment of his own physical condition. Is that right? Exactly. That's very consistent, and that's exactly – one of the other arguments that I made in this matter was that Mr. Jordan said, I need to lay down during the day. I can't – I have to change positions frequently. And the judge found that not only that Mr. Jordan – the ALJ found that not only was Mr. Jordan not credible, he also found Dr. Lamberton, his treating physician, to not give him controlling weight. And Dr. Lamberton not only is a treating physician, he's also an orthopedist who is – who's a specialist in the area where Mr. Jordan has his problems. So he should have been given even more weight than, you know, up – over and above because he's a specialist in the area that he – in the area that Mr. Jordan had his problems. If I remember correctly, the ALJ said that Lamberton's assessment there on his – on what he could do, his physical limitations, was not supported by adequate clinical objective findings. Well, he did – What's wrong with that? He did say – that's what the ALJ said. Right, that's what the ALJ said. That's what the administrative law judge said. But Dr. Lamberton did find that he diagnosed Mr. Jordan with a status post-acute cervical strain. He knew that he had all the surgeries. And then he had – I believe he had – I'm not positive. I'm sure he had the MRI results. He did. So he had – he had objective findings. And he's a treating physician. So, I mean, he wasn't – he wasn't preparing his report for – you know, he's preparing a normal report like doctors do in all of them. He wasn't looking at the entire record and making a report for Social Security. He was making a normal doctor's report like doctors do. So if he – if I had a – if somebody at the time had said, can you prepare this in a statement that says, you know, give all your objective findings, I'm sure he would have done that. But at that time, that's not the way he presented it. He had MRI findings, and he's also an orthopedist. So he knows – he knows about these type of injuries and can opine about them. So, I mean, and that's – and I believe – and my whole argument about this case, Your Honors, is that the – I do not believe that the administrative law judge provided adequate reasons for not only rejecting Dr. Lamberton's opinion, but also that because Dr. Lamberton did give the opinion that Mr. Jordan was – required the need to sit, stand, alternate positions, as well as lay down throughout the day, I do not believe that the administrative law judge adequately considered Mr. Jordan's testimony himself. He discussed all of those factors in his opinion. He didn't give them the weight that you believe that they should be given, but he did consider those factors in arriving at his decision, didn't he? He did consider them, Your Honor. And that was after – this was the second time it came to the administrative law judge, through a remand, and he did – he did address them, but as I said before, he gave – he didn't put the proper weight on the opinions where he should have because Dr. Lamberton was a treating orthopedist. And Mr. Jordan proved that he had this impairment through the cotton test. As you know, if you can prove that you have an underlying impairment, which he did, and there are some symptoms which he had, he's not – there is not any signs of outright malingering. So the judge has to specifically say why those – those problems, such as laying down, the need to lay down, is not credible symptom testimony. And in that case, he did – all he said, what he didn't say exactly, he didn't lay out the reasons as to why Mr. Jordan's need to lay down throughout the day was not credible. So according to the – according to the Ninth Circuit, according to Cotton, that's not – that's erroneous because Mr. Jordan – Mr. Jordan's testimony must therefore be considered credible because he didn't lay out that – didn't set out any facts. You have two minutes left. Do you want to save it for rebuttal? About a minute and a half, if that's okay. So, I mean, I guess I just want to sum up by saying that Dr. Lamberton, treating orthopedist, felt he was disabled. Dr. Rutledge, even though he's not a treating or acceptable medical source as a chiropractor, his opinion can be considered. And then Mr. Jordan's testimony also should have been found credible. And then if it had been found credible, he would have been determined to be disabled prior to his day to last insured because the vocational expert testified that there would be no work he'd be able to do with his need to sit, stand and lay down throughout the day. Thank you. Thank you. Good morning, Your Honors. My name is Tom Ellsbury. I'm here for Social Security. Good morning, Your Honor. I think that this case really boils down to two determinative elements. There's the nine-month period. This has been established, not contradicted. It's the last nine months of 1999. And the issues regarding the chiropractor, the treating physician, the credibility all revolve around essentially one issue. Does Mr. Jordan establish that he needed to lie down two to three times in an eight-hour day? And, in fact, there is no evidence during the relevant period supporting that assertion. Except Mr. Jordan. Pardon me? Mr. Jordan is the only one who would really know that. Mr. Jordan's subjective testimony is the only evidence during the period that asserts a need to lie down. And the LJ properly assessed that. Nobody else could really say whether he had to lie down. Well, I do believe there are functional capacity evaluations that could determine a need to lie down. I don't – there were none established here. There were none recommended here. And, in fact, the treating physician, Dr. Lamberton himself, did not opine that he needed to lie down during the relevant period. I thought he did say that he – that Dr. Lamberton did talk about his need to lie down. He did. After the date last insured. During the date last insured. He was still talking about his prior assessment of Mr. Jordan. That's quite possible. It was all linked together. I mean, this was all – looking at him for the same condition all along. Possibly. I don't believe the LJ saw it that way. And the record doesn't affirmatively assert that. How can you chop it up like that? Pardon me? How can you chop it up like that? How can I chop it up like that? Well – This guy – this fellow was in there for – the doctor said essentially the same thing over a period of time. Are we speaking specifically about the need to lie down? I'm talking about the three reports that are in the book. And the LJ accepted all elements of those reports. In fact, his RFC accounts for his need to alternate a sit and stand. But the LJ also – I mean, it's his duty to cut it up that way and look at the evidence to see if it supports the allegation, particularly subjective allegations. So are you really saying that he did have a need to lie down, but it developed in January, not December? I'm saying the only objective evidence of a need to lie down – actually, I wouldn't even say it's objective evidence. The only medical testimony about a need to lie down, chiropractor or treating physician, comes after the date last insured, which is what the ALJ specifically addressed, which is his duty to do. It's to address whether the evidence supports the claimant's subjective allegations of disability prior to the date last insured. It's the importance of that cutoff period. It's – it may be unfortunate if there's a deterioration. There's the option for subsequent obligation under Title 16 if, in fact, the deterioration establishes disability after the date last insured. But the date last insured is a hard and fast time. The chiropractor – in fact – I say, doesn't our case law say that when there's medical evidence that occurs after the insured period, the relevant time period, that you can still look at it so long as it relates back to the original assessment of the doctor? It does indeed. Isn't that what's going on here? That's exactly what's going on in the ALJ's review of the evidence. And he specifically addresses the two opinions, January and May of 2000, in regards to whether it's retroactive and finds there is no retroactive element to it. He says – and on top of which – Any retroactive. The doctor's opinion does not say he has always been. It's stated in the current – in – I don't read the ALJ's discussion of that issue that way, that suggesting that it got worse and that Dr. Lamberton's opinion that he had to lie down did not apply to that earlier period. Quite the opposite. I think he reads Dr. Lamberton's reports as saying that he improved by the time he saw them in May. But there's no suggestion there that he is saying that Dr. Lamberton's report in January or whenever it was that he did have to lie down didn't relate back. What he does is just discount Dr. Lamberton's opinion. He does. And, again, referring to case law, the ALJ appropriately, and I think properly, rejects even a trading source opinion when it is conclusory and unsupported by any substantial evidence. There is no substantial evidence of a need to lie down. There's no issue regarding that he has a cervical degenerative arthritis. That's not disagreed. The issue is does it cause this degree of limitation. There is no objective evidence supporting that assertion. And it's the ALJ's role to evaluate that evidence, the objective medical evidence or the treating physician's opinion, and weigh it and assess it. And I believe his assessment was consistent with 9th Circuit precedent and our regulations in that it doesn't specify how often he needs to lie down. Does he need to lie down two to three times for two to three to four hours or is it for ten minutes? How does this interact with his inability to sit and stand, which the ALJ did accommodate in his RFC, allowing no more than a two-hour sit, stand, or walk at a time within the eight-hour workday. But there's nothing within Dr. Lamberton's two reports or three reports, after the fact, that would show where he came to the conclusion, what supports his conclusion, what objective evaluation of Mr. Jordan supports a need to lie down other than Mr. Jordan's subjective representations, which the ALJ. We're running out of time. So tell me where in this report it shows why we should disbelieve Mr. Jordan's testimony. Well, I will cite the reasons that the ALJ relied on, which are all reasons that the 9th Circuit precedent has found to be acceptable reasons to reject that subjective testimony. And those are there is no opinion from any treating or examining physician during the relevant period that alleges a need to lie down. And that is the great element of this. When you tell us, can you tell us where in the transcript we find this? That the ALJ found this? Yes. The ALJ made this finding at 431. 431, 431. And he lists the lack of subjective symptomology that corroborates the degree of limitation alleged. It's a ---- Which, of course, is not necessary. I mean, if we have excess pain, all you need to find is the basic cause of basic injury. And excess pain we don't discount because there's no objective proof of the excess pain. Not for that reason alone, but it is a factor that is appropriately considered by the ALJ. The ALJ also relied on the board-certified orthopedic surgeon, who is also a specialist in orthopedics, who reviewed the entire record and said there was no supporting evidence for a need to lie down. Also a specialist. The other reasons, the conservative treatment that Mr. Lamberton sought or underwent during the relevant period, he didn't undergo intensive treatment with pain medication prior to his date last insured. Well, it says, for instance, he's rejected treatment such as Demerol injections. Then next page he says it is noted the claimant was denied Demerol injections. Which page are you referring to? You're referring to the AL2. The AL2 is the page after 431. It says in the paragraph beginning further, during review of the records with this doctor who expressed the opinion he relies on without having ever seen him, it says that during review of the records with Dr. Armquist, it is noted the claimant was denied Demerol injections. Now, the page before they say the problem with him is he didn't take Demerol injections. I believe that both could exist. It's quite possible he was denied Demerol injections. There was some concern by one of his doctors at an earlier time. So you think the reason to reject his testimony is that he both rejected Demerol injections and was denied Demerol injections? No. I believe that that would be a ñ okay, let's remove that one. If there are problems with the Demerol injection, the conservative treatment still goes. What degree of treatment he sought for his limiting pain or his need to lie down, his need to sit and stand. There is no intensive treatment. What does that mean, no intensive treatment? He had constant treatment with a chiropractor. He had constant treatment with a chiropractor, which was described, as I believe, in fact, Dr. Lamberton referred him to Dr. Wellborn, the chiropractor, who gave very simple chiropractic treatment and very simple exercises. The credibility reasons, an acceptable reason to reject credibility is there is no objective basis for the specific limitation. The cervical pain, the cervical, evidence of a cervical degenerative disc is accepted, but the FDA does not need to accept that it caused that degree of pain. And the other elements, like the conservative treatment, whether Demerol is rejected or accepted, the possible secondary gain, the absence of emergency room intervention for somebody who says he needs to lie down, with that frequency, it's a reasonable conclusion, I believe, by DLJ to say, where is the evidence that it was causing that impact on his daily life? There is none prior to the date last insured. Thank you. Thank you. Your Honors, I'd just like to conclude by stating that Mr. Jordan had three surgeries between 1986, 1987, and 1984. He stopped working from 1992 to 1995, and then he began his own business from 1995 to 1995. Now, if he could have worked, he would have been working after that March 18, 1995. Motor vehicle accident. Now, he couldn't work anymore because he had to lay down throughout the day. He could not. He had to alternate sitting, standing. He had to lay down during the, through the course of a day. And the testimony was that he not only had chiropractic treatments, he had been prescribed medications, he had steroid treatments, and even though he didn't have any emergency room visits, he was being treated through chiropractic. In fact, his testimony was that he went to the chiropractor so much that he felt like he couldn't breathe. That's why he was going so much. He had to lay down throughout the day, and he was, in fact, the only person, and his subjective testimony should be believed, Your Honors, because he's had all these surgeries, and he had a work history where if he could have gone back to work, he would have. He just wasn't able to. And if you believe his testimony, then you'd find him disabled. Thank you. Thank you. Case just argued will be submitted.
judges: Reinhardt, Paez, Strom